Mr. Kirkland, you may proceed. May it please the court. Counsel. Good morning, my name is Bruce Kirkland and I appear before you today on behalf of the defendant, Mr. Earl Smith. Mr. Smith was deprived of a fair trial where the trial court denied his motion to suppress statements and where the trial court rejected his tender jury instruction, asking that the jury be instructed with the definition of knowledge. As it applies to the charge against him in this case, first degree murder. I'd like to begin and discuss the jury instruction issue with your honors this morning. When the trial court rejected the proposed jury instruction, IPI 501B could abuse its discretion by not fully informing the jury of all of the elements of the offense here in a way that they could fully consider the defendant's defense at trial. Counsel, 501B was not in the original additions of IPI criminal was added later as a result of an appellate court decision. Is that correct? That is correct, your honor. And the committee also in its notes takes the position or takes no position as to whether that definition should be routinely given in the absence of a specific jury request. Is that correct? That is correct. That is in the committee notes. And I think the holdings stem from a case in which the jury indicated it was needed a definition of knowledge to be clarified. There was some confusion that did not occur in this case, correct? There was no jury question. There's no indication from the jury to the trial court that it wanted a definition of knowledge. It was the defendant's request that the jury be instructed. All right. But in light of the history of the rule and that of the committee comments, where's the error in that routinely giving it? The committee comment also includes the notation that if given, it should be given when the result or conducted issue is the result of conduct described by the statute defining the offense. That is the case here where the defendant was charged under 9182. This court in 2009 considered the case of Dunmore in which a defendant was charged under 82 with first degree murder, and he was charged similarly to the defendant here. In both Dunmore and in this case, Mr. Smith was charged with knowing his acts created a strong probability of great bodily harm, excuse me, great bodily harm as opposed to death or great bodily harm, which is reported in the statute. In Dunmore, this court considered that the element of knowledge is essential to that charge. When you charge someone with knowing their acts create a strong probability of great bodily harm, sometimes you have to have the jury find that they committed a known killing. The knowledge element is central to the charge in this case. And when you have a charge, the nature of the charge is such that you have to have knowledge as a central element that the jury finds that the state proved beyond a reasonable doubt. We agree that knowledge is a central element, but People v. Powell says that the words intentionally and knowingly have a plain meaning within the jury's common understanding. So we have to kind of balance Powell v. Browder and decide whether this is an abuse of discretion, and that is the standard, correct? It is an abuse of discretion standard in this case, Your Honor. That's correct. I mean, common sense tells us that even though you ask people what knowledge is, they have their own definition of that. And I think when you have 12 jurors, you're going to have 12 different definitions of knowledge and what is knowledge. I know Powell is what it is. Powell says it is within the common understanding of the jury. But you run the risk when you don't define knowledge of jurors applying their own definition. Even if one juror defines in their own mind knowledge as knew or should have known, oh, he should have known what he was doing created a strong probability of great bodily harm, you've deprived the defendant of the ability to have the jury consider the legal standard that should be applied in this case. And that's expressed in 501B. So are you saying that in every case in which the indictment would be similar to the indictment in this case, the judge would be committing reversible error if he did not give this knowledge instruction by request? Yes, if it's requested by the defendant, it should be given in every case. I mean, this court considered a similar question in People v. Pertz, which I discussed in my brief. And that was a case in which the defendant, Pertz, was charged under A2 also. And in that case, he was charged with striking his wife with a baseball bat with the knowledge that he would use death instead of great bodily harm. And in that case, the state requested the knowledge instruction. The first of the two knowledge instructions in 501B, the court gave the instruction. The defendant on appeal said that, took the power position that knowledge is within the common understanding of jurors. And this court said that it was unnecessary instruction in that case. But we said it was not an abuse of discretion to give it under the facts of that case. And under the facts of that case, if I recall correctly, didn't the defendant testify he thought the victim was dead when he hit her in the head with a baseball bat? That's correct. And it's analogous to what we have in this case where the defendant testified he did not know he was causing great bodily harm to his wife when he struck her. And that factual contention of the defendant is supported by Dr. Choi and the autopsy results where the wounds were to the legs and the arms. I think it raises a jury question of what was his mental state here. His defense was, I didn't have the requisite mental state that I was causing great bodily harm. And when that becomes a central issue in the case, we should give the jurors every opportunity to apply the correct legal standard, which is according to the instruction 501B that the defendant is consciously aware. That narrows it down. That gives the juror, an individual juror and the jury collectively, a legal definition that they can apply and say, was the defendant consciously aware? And without that instruction as requested by the defendant who asked that the jurors be told of that definition and allowed to judge him and to judge the strength of the state's case and to determine whether he was proved guilty beyond a reasonable doubt, it's an abuse of discretion because it takes away the jury's full and proper consideration of the central point of the case, the knowledge element of this case. The other reason that the instruction should have been given in this case is that the nature of the statute that he was charged under, A2V, is written such that the knowledge element goes to both his conductors and the jurors. And the jurors have to reflect on the results of his conduct. And in that case, it almost gives the jury two different questions. They've got to consider whether he had the requisite mental state of when he committed the accident, whether his conduct met the requisite mental state, and whether he was consciously aware that the results of his acts met the legal definition of knowledge. For these reasons, it was an abuse of discretion not to give the instruction as requested by the defendant in this case. Were you the trial attorney? No, he had private counsel, other than myself. And how was the state of mind argued in the closing arguments by the defense attorney in the state? I have not reviewed that in some time. It's a 4,000-page record. And I don't want to speculate, Your Honor. I apologize for not knowing the answer to that question, but I don't know specifically. The trouble is there's a legion of cases that look upon failure to give the IPI definition of knowledge as, at most, harmless error. Similar type cases where conduct is a big issue in the case. And you'd have to take the position you're wanting to change in all that existing case law. I'm taking the position that Justice Hudson says it would be a rule of law that when the defendant asks for that instruction, it must be given. You know, there's a lot of... It results in reversible error. You know, there's also the kind of bedrock rule of jury instructions that if there's some evidence that supports an instruction, it should be given. And given the defense in this case, that he didn't satisfy the knowledge element, he didn't know that he was causing great bodily harm or that his conduct would result in great bodily harm. What's the standard of review of a judge refusing a standard instruction? Abuse of discretion. And that's a very, very thin type of standard of review. By thin, I mean it's the easiest standard to sustain on review. Yes. Yeah, I understand that that's a significant obstacle here. You know, there's deference to the trial judge in this case, but that doesn't mean that the trial judge is always right. And especially in this case where that's the central issue that the jury had to answer. Did he commit a known killing? In the words of Dunmore, was it a known killing? You can't allow people to be convicted when they're charged with knowing their conduct will cause great bodily harm unless the state proves beyond a reasonable doubt it was a known killing. And the way to ensure that is to issue this instruction when it's requested by the defendant. You know, it makes a lot of common sense, I think, to say let's not just assume that the jurors know what knowledge is in a legal sense. You know, there's all different kinds of approaches to the layman's concept of knowledge, you know, book learning versus street wise. We have limited time. What do you think your main issue is regarding the statements of the defendant? I think the main issue is that the techniques employed by the police here where they picked up Mr. Smith as he was entering a taxi cab at the hospital. He was with the police at the police station for over six hours, maybe eight hours before he was charged with murder. He was questioned in an interview room at the police station. He was asked to give a written formal statement and consented to a search. He gave a written consent to search of his apartment. All of this without any random warrants. I believe that those were a custody issue. So the issue was obviously whether or not he's in custody or the functional equivalent. Correct. Correct? Yes. Now, I guess the issue becomes ultimately the trial court having heard the testimony of the defendant as well as all the other witnesses apparently chose to believe the police. Why couldn't the trial court have done that? The trial court said in its final fact in a suppression hearing he was entitled to make those judgments. That's correct. That's part of the standard of review, the final fact. So if the trial court did that, what would the error be? Well, the error is you take those findings and facts and apply a de novo review to it. And the question becomes the facts found by the trial court, do those indicate in the de novo review a custodial interrogation? And there's factors that go into that, including the guys being interviewed in an interview room at the police department. How were the pre-Miranda statements used at trial? Because my understanding is he did not make any inculpatory statements during the pre-Miranda phase of this. Did they actually submit some of those at trial? Yes. They were during trial that Detective Brown, who conducted the bulk of the daytime pre-Miranda interrogation, testified regarding all the events that occurred that day. And, you know, it's creating the inference of a guilty mind is the prejudice here. I mean, when you say he's waffling, he's changing his story, he's inconsistent. So he was put in as a false exculpatory and argued as such at trial. I believe so, yes. What is your argument on the question first warned later? Obviously, the United States Supreme Court is troubled by that interrogation strategy. So how do the facts of this case fall within that prohibition about question first warned later doctrine? Yeah, Siebert is three years old, more like six years old now. And it's been analyzed and parsed by the public courts and the federal courts. You know, the Supreme Court in Lopez finally agreed on a framework of a Siebert analysis, which is the same as Montgomery, which is what I cite in my brief. So how does this case fall within the purview of that decision? Well, once you have the question is if you have custodial interrogation and then warnings and statements, post-warning questions, do the post-warning statements come in? In this case, they shouldn't because of the overall mode of interrogation. What Siebert addressed was the police technique in which the Supreme Court and Siebert observed was a police technique. And they said we're not going to allow this technique anymore. We know what it is, but how do the facts of this case fall within that prohibition? I mean, what evidence is there in the record that the police engaged in the question first warned later? Well, there's the suitor, the plurality factors, I call them. The four justices and the plurality opinion written by Justice Suter listed five different factors that you look at. And, you know, the similarity of statements is only one of the five factors. You've got an overlapping content of the two statements. You've got the timing and setting of the first and second statements. It's all part of the continuous day-long. And again, did that apply here or how? I'm sorry? How did that apply in this case? What happened in this case that brings it within the purview of the Siebert decision? Confine it to this case. What happened here? Okay. The defendant was questioned all day long. He asked that he make a written statement. But Detective Brown, who was also present at the poster bomb, ran the statement, then it was tape recorded. This is all part of a day-long process designed to elicit incriminating evidence from the defendant. And, you know, you've got Siebert on one end, which is clearly a classic ask first, warn later situation, where the exact same questions are asked later after a confession. You have Elbert, excuse me, Elstad, which says that basically it just becomes a post-morandum voluntary test. Then you have this huge gray area in between those two. And this is part of this gray area is that the courts are still trying to figure out what are we going to allow the police to do to criminal defendants. You can pick them up in a taxi cab at the hospital where his wife just died, take them to the police station, interrogate them all day long, wait six or eight hours, and then give them Miranda warnings. And then in his world, it's all part of one continuous interrogation. And to use the entire statement from start to finish comes closer to Siebert and the illegality of ask first, warn later technique than it does to Elstad, where we just see if it was a post-Miranda statement voluntary. All right. Thank you. I would ask that on behalf of Mr. Smith, this court reverses convictions for first degree murder, rename for new trial. Alternatively, amend the judgment order to reflect the correct credit for time served. Thank you. Good morning, your honors. I guess I'll take the first or the last thing you were talking about Siebert. I don't think anything in Siebert applies to the facts to the case. In this particular case, it's clear as soon as the defendant, it became a homicide investigation. The defendant was Miranda. He asked for a lawyer and he wanted to remain silent. There was no more questioning after that until he initiated the speaking with the other police officers. So that was after the results of the autopsy came back. Right. There was a beating involved. Right. It was at 430 and the police were told that after the autopsy that she died from blunt force trauma. And that's when they brandized him. And that's when he said he would like to like a lawyer and remain silent. Well, they put him in a cell and a couple hours later, I think it was 615. He told an officer or detective was coming by or a commander, McCleary, that he requested a lawyer. But now he wanted to make a statement. And so the commander went and got someone else to take him to an interview room. And that was Detective Martin. Before he even got into the cell, he told Detective Martin that he wanted to get the situation over with. And this time he would tell the truth. As they were walking to the interview room, he told Martin, I didn't mean to kill my wife and that he did it. And then when he got into the interview room with Detective Brown, he said, man, I didn't mean to kill my wife. And in fact, Detective Brown said, wait, don't say anything until the lieutenant, the person who's supposed to interview you, comes in. Those statements were admitted to trial, right? Those statements were admitted to trial. Correct. And the state's position was they were voluntary statements made. They were not the product of any interrogation. Correct. Correct. And then he was subsequently Mirandized again and then gave another taped sentence, a taped confession. So there was no confessions before he was Mirandized. And so it doesn't, CFER doesn't apply at all. He absolutely made no inculpatory statements until he was put in a cell after he was Mirandized a couple hours later. The fact that it was a death investigation before it was a homicide investigation, the police were using as, you know, just to help them investigate how this woman died. He had first made some exculpatory statements. You know, first he said, you know, his wife was out. He was with somebody, you know, his wife looked like she had been beaten up a little bit. And they asked him, he went with him to the his own apartment. They let him drink a beer. He claimed six beers. But they said, you know, he he he drank a beer. He was talking to him. It's obvious that he he was not in custody at that time. All right. The defendant alleged that he was drinking six beers when he went back to the apartment with the police. Yeah. He testified to that. Pardon? Where does that come from? Is that in the record? I think that, yeah, I know it's in the record. I couldn't tell you exactly where, but he he he made that claim. And, you know, clearly when you read the record, you see that certainly the trial court believes police officers, the five or six detectives over his story. And certainly, you know, that witness credibility decision, there certainly was an abuse of discretion. If there's no other questions on that, I'll move on to the instruction issue. I think counsel has indicated that knowledge was the central issue in this case. Do you agree with that? I think knowledge is one of the issues. It's his intent. But I think so. Why shouldn't the court have instructed on knowledge and given the jury the actual knowledge instruction under the law? Well, your honors, when I read this instruction, I feel actually confuses a jury's anyone's plain understanding of knowledge. I think it muddies the waters rather than clear it up. I read this. A person knows the nature of attendant circumstances of his conduct when he is consciously aware that his conduct is of such nature or such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such facts exist. I had to read that, I swear, ten times to kind of glean out what they're trying to get at. I think, number one, that probably at all costs the trial court should avoid using that instruction because I think the instruction itself is very confusing. The other thing is I think it's true. If it's difficult to understand and you take the position that the jury would have trouble understanding it, would that help or hinder the defendant? Well, I think it would hinder the defendant, frankly. I think they would finally just commit to it. I think, like they say, like they said in Powell, that this instruction tends to confuse the jury. You know, jurors know what knowledge is, that somebody has an understanding. They pretty much know if they do one thing, a certain circumstance is going to happen. In this case, it certainly was in the jury's purview to determine whether the defendant had knowledge that, you know, hitting his wife with a 2x4 so hard that her hemoglobin count was like at 29, almost 30,000 nanograms a milliliter when the usual test is like 0 to 91. It's clear that the defendant hit this person so hard. We didn't need anything to clarify it. A standard idea of what knowledge is when someone hits someone with a 2x4 so often and so hard that the pathology report comes out that way. I just see no reason to. The jury didn't ask for the instruction. And I think the trial court went through a nice logical process and said, you know, first, Powell, you know, they pretty much know the plain meaning. This usually tends to confuse the jury. We'll wait until the jury asks for an instruction or for a definition of knowledge. And they never asked for that definition. I think it was pretty clear cut that way. They didn't need any clarification. And I believe Perch is, frankly, in Perch, I think maybe it probably was not a good idea to give that instruction. I don't think it was abusive discretion. Certainly that's different than saying, well, maybe that was air. It wasn't abusive discretion. But certainly that doesn't rise to the level that the trial court, in this position under these facts, abused its discretion in not giving that instruction. Now, what's your understanding? Why is this case distinguishable from the whole thing in Perch? I don't see much distinguishing factors in there besides just the fact that supposedly there's testimony in Perch that the victim, he already thought the victim was dead. And then he hit her with a baseball bat. Well, that doesn't, to me, that doesn't even make sense. And I don't think to a common jury that would make sense. So I think it's more of a factual situation. But again, I think this jury instruction is very confusing, certainly for a layman. And I think there's just a common understanding of what knowledge is. And I think that instruction just muddies up the waters. And certainly the trial court didn't abuse its discretion. In any event, the jury in this case did not indicate any confusion over the terminology. No confusion. There was no question in their minds. And I think that's supported, like I said, by the pathology report. No other questions? Thank you again. Counsel, can you comment on one point? Your opposing counsel raised an interesting argument. Obviously part of your theme is that the defendant was in custody when he was brought back to the apartment by the police. He testifies he drank six beers. Is that correct? Yes, that is correct. That was his testimony, Judge. And is it likely the police are going to allow someone who's under arrest to sit there and drink six beers at their house? Well, the officers testified he drank one beer. But he said he drank six. He drank six. Obviously, if the trial court is going to rule in favor of the defendant, the trial court would have to find the defendant credible, would it not? Yes. On this question, first of all, and later, you would agree that Lopez tells us that there's a threshold determination that the court has to look at, and that is deliberateness, that the police are actually doing this technique deliberately. It's not just something that happened. Counsel raised an interesting point, and that is that the defendant was warned after the autopsy, after this went from a death investigation to a homicide investigation. Doesn't that weigh against deliberateness, a finding of deliberateness? One thing I ask myself as I was preparing for today is why didn't they Mirandize him when they picked him up first thing in the morning? It's a death investigation. We need you to come with us to the police station. He's asked to give written statements. He's asked to give a written consent to search his apartment. Hours go by where he's interviewed. Why wouldn't they Mirandize him? And what is the difference between a death investigation and the only thing that was different was autopsy results? The deputy coroner was there first thing in the morning, Mr. Barrett, who alerted the police that he had concerns, apparently. I don't recall his exact testimony. But, you know, to kind of label it. You know the police are only required to Mirandize when the defendant's in custody and under interrogation while in custody. And if you believe the police story, the defendant never was in custody until much later that day. In fact, until they said he was under arrest. You know, that raises an interesting point. And you see this in a lot of cases, Your Honor. You know, the defendant said, I thought I wasn't free to go. And the state always says, whoa, whoa, whoa. That's not the standard here. We use an objective standard. We don't use a subjective standard. But when the police said he was free to go, he could have left anytime he wanted to. Somehow that adds more weight than the defendant saying, you know, I thought I wasn't free to go. When you're sitting in an interview room in the middle of a police station, how could you not think you're in custody and think you could just get up and walk away from that? I don't know why they didn't Mirandize him earlier and hang a label on it of it was just a death investigation. And then the autopsy results, which was kind of just a confirmation of what they knew already, suddenly becomes changes the nature of the interrogation. I think that it was a custodial interrogation much earlier than he was supposed to be arrested. I mean, sitting in a police station is certainly a factor. We're supposed to look at the totality of the circumstances. But again, the case was a plea with cases where someone sitting in a police station and courts have found the Supreme Court, public courts have found that person not to be in custody. Was it just the duration of the time he sat there? Well, other than sitting in the police station, he arrived there, uncuffed, according to police, uncuffed through the front door of the police station. The door was open and unlocked. He was using his telephone, using his cell phone. I mean, tell me what other than maybe the duration, I guess, is what you're looking at. The duration. You know, the setting is extremely important here. Why did they have to take him to the police station? Why couldn't they have interviewed him at the hospital? You know, is it convenience? Is it to create an environment where he's more likely to speak? You know, why did they feel they needed a written consent to search his apartment? If it's the scene of a death investigation where the portion of their investigation occurred, could they not go there without a written consent? It's kind of like they took steps in some areas, but they didn't mirandize them. And it seems internally inconsistent. It seems part of their process of handling this defendant, to pick him up, put him in the back seat of a squad car, not a squad car, probably a detective's car, drive him to the police station. Yes, they did take him through the front door and insert him through the booking area. But he's in the bowels of the police station. You know, they gave him, he said he had McDonald's and he was allowed to use the facilities and use the telephone. But he accompanied them, the officers, to his apartment. Why didn't he go back with them? You know, he testified that he felt he was compelled to do so. Not compelled by them saying you have to go back, but he felt the circumstances required him to accompany them. You know, and I think that a reasonable person from an objective point of view, in person, Mr. Smith's perspective would have felt the same. You know, inability to just stand up and say, I got to be going now. Can you show me the way out of this interview room and how to get out of the police station? All right. Clark stands in recess and the case is taken under recess.